UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| KAREY R. LUCHTEL, | CASE NO. C07-1448 RSM |
| Plaintiff, | |
| v. | ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT |
| OFFICER CLARK HAGEMANN, *et al.*, | |
| Defendants. | |

## **I. INTRODUCTION**

This matter comes before the Court on two separate motions for summary judgment brought by Defendants. (Dkts. #14 and #15). Defendants argue in both motions that Plaintiff's federal and state law claims, arising from an incident in which she was detained by police officers, should be dismissed. Plaintiff responds that there are disputed facts that preclude summary judgment.

For the reasons set forth below, the Court GRANTS both motions for summary judgment in their entirety.

## **II. DISCUSSION**

### A. Background

The instant lawsuit arises from a series of events that occurred on May 18, 2005. That evening, two Seattle Police Department Officers, Defendants Clark Hagemann and Thomas Hanley, were dispatched to a Seattle area home in response to several 911 calls. The calls

ORDER
PAGE - 1

reported that a woman was outside screaming that someone was trying to kill her. (Dkt. #17, Decl. of Lynch, Ex. F, Event Log). The calls also indicated that the woman was hiding under a vehicle with a child, and that she began screaming that she wanted to kill herself. (*Id.*). Upon arriving on the scene approximately seven minutes after the first 911 call, the officers saw Dan Luchtel outside. Mr. Lucthel informed the officers that his wife, Plaintiff Karey Luchtel, was a frequent cocaine user and was running around the neighborhood in a delusional state, out of control on drugs. Mr. Luchtel further indicated to the officers that his wife had run into a neighbor's house, pointing to the home of Edwin and Ruth Wald.

Much of what occurred next is in dispute. According to the officers, they knocked on the Walds' door and were invited to come in by Mr. Wald. The officers saw Plaintiff across the living room clutching a seven year old boy, which they later confirmed was her son. The officers claim that Plaintiff "appeared to be paranoid and confused." (Decl. of Lynch, Ex. D, Incident Report at 2). The officers further contend that each time they advanced towards Plaintiff, she would grab her son, "jerking him violently to herself so she could hug him." (*Id.*). Plaintiff then asked the officers whether they were "real police or if [they] were part of the conspiracy to kill her." (*Id.*). Fearing for the child's safety, the officers attempted to calm Plaintiff down and remove the child from Plaintiff, which they were able to do with the assistance of Mr. Wald. The officers also submitted a radio request for medical transport.

Once the son was removed, the officers indicate that Plaintiff suddenly lunged at Mrs. Wald. Officer Hanley notes in his declaration that:

> She appeared to be grabbing Mrs. Wald to use her as a human shield. Mrs. Luchtel grabbed her so quickly and with such force that she drove her to the hardwood floor of the Walds' living room. Mrs. Wald hit her shoulder on the floor and her blouse was torn open by Mrs. Luchtel's grip on it. Both women went crashing to the ground.

(Decl. of Hanley, ¶ 10).

Officer Hanley immediately grabbed Plaintiff to pull her off, at which point he claims that she "started scratching, biting, hitting and kicking" at both he and Officer Hagemann. (Incident Report at 2). Officer Hanley attempted to handcuff Plaintiff, but Plaintiff fought ferociously in resisting the officers' attempts to detain her. Eventually, the officers placed

ORDER
PAGE - 2

handcuffs on Plaintiff but the officers note that "[w]e had to restrain her for over 10 minutes until [the medical response unit] arrived because of the suspect's out of control behavior." (*Id*.). After the medics arrived, the officers indicate that Plaintiff continued in her delusional state, screaming and yelling that the officers would be killed. The officers also allege that while Plaintiff was being transported to the hospital, she made religious references and attempted to masturbate.

On the other hand, Plaintiff presents a completely dichotomous version of events. Plaintiff claims that once she was in the Walds' home, she was calm and lucid. She also indicates that Mr. Wald had taken her son downstairs before the officers arrived. Plaintiff then contends that the officers did not knock on the door, and lunged directly at her without any explanation or any warning. Plaintiff alleges that the officers ultimately broke her arm and separated her shoulder. Furthermore, Plaintiff maintains that although she resisted the officers' attempts to place handcuffs on her, she never tried to run away from them. She claims that it was impossible for her to restrain the officers' show of force due to their size in comparison with hers. Plaintiff contends that she has suffered permanent injuries requiring the daily use of painkillers.

Significantly, it is undisputed that Plaintiff was under the influence of cocaine during the events at issue. The medical examinations conducted at the University of Washington Medical Center on May 18, 2005 unequivocally indicate that Plaintiff's urine sample tested positive for cocaine. (Decl. of Lynch, Ex. E). Plaintiff further acknowledges in her deposition that she would have no basis to refute the fact that she had used cocaine at 4:00 o'clock that day. (Dep. of Luchtel, 61:17-20). It is also not in dispute that Plaintiff was diagnosed with a right humerus Hill-Sacks fracture and a dislocation of her right shoulder one day later. (Decl. of Lynch, Ex. E). It appears that Plaintiff underwent surgery to repair her right shoulder. Lastly, it is not in dispute that Plaintiff was charged with two counts of assault and resisting arrest based on the events described above by the City of Seattle. (Decl. of Lynch, Ex. G). The charges were eventually dismissed by a Seattle Municipal Court Judge without prejudice pursuant to "proof problems." (Dkt. #19, Decl. of Kannin, Ex. 5).

Based on these events, Plaintiff brought the instant lawsuit in King County Superior Court on July 16, 2007. In her complaint, Plaintiff brings 20 claims against Officer Hagemann, Officer Hanley, various unnamed police officers, then Chief of Police Gil Kerlikowske ("Chief Kerlikowske"), the City of Seattle ("the City"), and various unnamed municipal policymakers of the City. Plaintiff's first 10 claims against all Defendants are federal claims under 42 U.S.C. § 1983 for arrest without probable cause and excessive force. Plaintiff's subsequent six claims against the officers, various Jane and John Doe officers, and the City are state law claims for assault and battery, false arrest, and negligence. Plaintiff's remaining four claims against Chief Kerlikowske and various Richard and Jane Doe municipal policymakers are state law claims for negligent hiring, training, and supervision.

The Defendants properly removed the case to this Court on September 18, 2007. After the conclusion of discovery, Defendants brought the instant motions for summary judgment. The first motion addresses the claims made against the officers (Dkt. #14), while the second motion (Dkt. #15) addresses the claims against Chief Kerlikowske and the City.

**B. Standard of Review**

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The Court must draw all reasonable inferences in favor of the non-moving party. *F.D.I.C. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992), *rev'd on other grounds*, 512 U.S. 79 (1994). The moving party has the burden of demonstrating the absence of a genuine issue of material fact for trial. *See Anderson*, 477 U.S. at 257. If the moving party meets its burden, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Cline v. Indus. Maint. Eng'g. v. Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000). Mere disagreement, or the bald assertion that a genuine issue of material fact exists, is insufficient to preclude summary judgment. *California Architectural Bldg. Prods., Inc., v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987).

Genuine factual issues are those for which the evidence is such that "a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. Material facts are those which might affect the outcome of the suit under governing law. *Id.* In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (citing *O'Melveny*, 969 F.2d at 747). Conclusory or speculative testimony is insufficient to raise a genuine issue of fact to defeat summary judgment. *Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 60 F. 3d 337, 345 (9th Cir. 1995).

**C. Plaintiff's John Doe Claims**

As a preliminary matter, the Court addresses Plaintiff's claims against unnamed police officers and municipal policymakers of the City. As Defendants correctly point out, the deadline for joining additional parties in this case was March 24, 2008. (*See* Dkt. #12). However, Plaintiff did not identify these unnamed individuals at this time or at any point thereafter. Plaintiff does not dispute this contention in her responsive pleadings. Therefore all claims against these unnamed individuals shall be dismissed.

**D. Plaintiff's Federal Law Claims**

Plaintiff brings federal claims against all Defendants under 42 U.S.C. § 1983 for arrest without probable cause and excessive force. The Court addresses each federal claim in turn.

1. Probable Cause for Arrest

It is well-settled that "[p]robable cause is a complete defense to an action for false arrest and imprisonment." *Orin v. Barclay*, 272 F.3d 1207, 1218 (9th Cir. 2001) (citation omitted). To determine whether an officer had probable cause to arrest an individual, courts should "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (internal quotations and citation omitted). This standard "is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Probable cause "means less than evidence which

would justify condemnation . . . [i]t imports a seizure made under circumstances which warrant suspicion." *Locke v. United States*, 11 U.S. 339, 348 (1813). Importantly, "an officer need not have probable cause for every element of the offense." *Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994) (citation omitted).

Here, Defendants argue that the officers had probable cause to arrest Plaintiff for assault, obstruction of justice, and possession of a controlled substance. Notwithstanding the former or the latter, the Court finds it clear that both officers had probable cause to arrest and detain Plaintiff for obstruction of justice.

The Seattle City Municipal Code makes it a gross misdemeanor if a person:

> (1) intentionally and physically interferes with a public officer; or (2) intentionally hinders or delays a public officer by disobeying an order to stop given by such officer; or (3) intentionally refuses to cease an activity or behavior that creates a risk of injury to any person when ordered to do so by a public officer[.]

SMC § 12A.16.010

Additionally, under Washington law, "[a] person is guilty of obstructing a law enforcement officer if the person willfully hinders, delays, or obstructs any law enforcement officer in the discharge of his or her official powers or duties." RCW 9A.76.020(1). A person's refusal to obey an officer's lawful command constitutes "an obstruction of a police officer in the exercise of his official duties." *State v. Little*, 116 Wash. 2d 488, 496 (1991).

There is no question that the objective evidence in this case indicates that the officers had probable cause to arrest Plaintiff for this crime. This evidence includes the information acquired by the officers prior to arriving at the scene, Plaintiff's conduct once the officers arrived at the scene, and Plaintiff's resistance to the officers' attempts to subdue Plaintiff throughout the incident. For instance, it is undisputed that the officers were dispatched to the scene in response to several 911 calls that reported a woman screaming outside that she was either going to kill herself or that someone was trying to kill her. It is also undisputed that once the officers arrived, Plaintiff's husband informed the officers that she was running around the neighborhood, out of control on drugs. It is further undisputed that the medical tests performed on Plaintiff on May 18, 2005 confirm that Plaintiff had cocaine in her system.

Moreover, Plaintiff cannot dispute that once the officers were inside the Walds' home, Plaintiff's delusional state escalated. Plaintiff acknowledges that "when [the officers] came in, I didn't think they were real police. I did stand up, and I said that . . . I matter of factly stood up and said that they're not the police." (Dep. of Luchtel, 85:17-22). This is consistent with the officers' report, which indicates that Plaintiff "asked us if we were the real police or if we were part of the conspiracy to kill her." (Incident Report at 2). This is further corroborated by Mrs. Wald, whose deposition testimony provides:

> Q: And so once the police came into your house, how did things change?
>
> A: In an instant. They were just – as soon as she saw them, she just went, *I would say ballistic*. She says, "Don't let them come in. They're going to take – they're going to kill me. This is not the police. They're going to kill me."

(Dep. of Ruth Wald, 42:18-24) (emphasis added).

It is also clear that at one point during the encounter, Plaintiff used Mrs. Wald as a shield to block herself from the officers. Plaintiff's deposition testimony provides:

> Q: Did Mrs. Wald stay sitting next to you or did she move away?
>
> A: Well, I know her testimony was different, but what I recollected was that I stood up, and the police lunged at me, and I grabbed onto Mrs. Wald. Now, I thought we were sitting, but were we sitting or standing, actually, I'm not quite sure about that. I would have guessed she was – I think for some reason she was on the couch. But she could have been standing. I just remembered grabbing [her] and I said don't let them take me.

(Dep. of Luchtel, 75:3-10).

Again, this is consistent with the officers' report that indicates that Plaintiff lunged at Mrs. Wald. It is also confirmed by Mrs. Wald, who claims that "I'm sure [Plaintiff] grabbed me." (Dep. of Ruth Wald, 47:15). Mrs. Wald specifically states that "when we both fell on the floor, she, she grabbed my blouse and tore it, because she was in such panic to get away from them that she – we both landed on the floor[.]" (*Id*., 39:5-8).

The objective evidence additionally reveals that once the officers attempted to remove Plaintiff from Mrs. Wald, Plaintiff resisted their contact. Plaintiff acknowledges in her deposition that "I thought that they were going to . . . handcuff me, and I didn't want them to handcuff me . . . So I was resisting them handcuffing me." (Dep. of Luchtel, 77:24-78:5).

ORDER
PAGE - 7

She further states that "I just remembered . . . don't let them handcuff me . . . so *I was trying to do everything I could to keep them from handcuffing me.*" (*Id.*, 78:10-13) (emphasis added). Mr. Wald confirms this resistance, as his deposition reveals:

Q: Is it accurate to say that the entire time you saw her with the police, she was struggling with them?

A: She was struggling with them when I came in, and to the best of my recollection . . . she was still struggling right to the end . . .

(Dep. of Edwin Wald, 56:13-17).

This deposition testimony is ultimately consistent with the officers' report, which indicated that Plaintiff "turned on us and started scratching, biting, hitting and kicking at us." (Incident Report at 2).

Based on this irrefutable evidence, there is no question that the officers had the authority to arrest Plaintiff for obstruction of justice. A reasonable police officer in either Officer Hagemann or Officer Hanley's position would certainly interpret Plaintiff's behavior as erratic, delusional, and dangerous to the Walds and the officers. Moreover, this behavior was interfering with the officers' fundamental duties under either SMC § 12A.16.010 or RCW 9A.76.020(1). And once Plaintiff resisted the officers' intention of seizing Plaintiff to gain control of her, there is equally no doubt that the officers had the authority to handcuff her and keep her restrained until the medics arrived. Indeed, it would have been unreasonable for the officers to stand idly by given Plaintiff's drug-induced state.

Nevertheless, Plaintiff argues that summary judgment is premature because there are disputed facts. However, Plaintiff only offers conclusory and self-serving testimony in support of this contention. More importantly, this argument ignores each and every material concession made by Plaintiff mentioned above. It also ignores the objective testimony of both Mr. and Mrs. Wald, the only other eyewitnesses to these events. These testimonies are consistent with the officers' Incident Report, and these facts form the basis for the requisite probable cause needed to arrest and detain Plaintiff. As a result, Plaintiff's claims against Officer Hagemann and Officer Hanley for arrest without probable cause shall be dismissed.

### 2. Excessive Force

The Fourth Amendment protects individuals from the excessive use of force by police officers to accomplish an arrest, even when that arrest is supported by probable cause. *See Palmer v. Sanderson*, 9 F.3d 1433, 1436 (9th Cir. 1993). Whether an individual is subject to excessive force under the Fourth Amendment requires courts to consider the reasonableness standard set forth in *Graham v. Connor*. 490 U.S. 386, 396 (1989). To determine whether force is reasonable, a court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. at 396 (internal quotations and citations omitted). Among the factors courts are to consider are: (1) the severity of the crime; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest." *Id*. (citation omitted).

While these are the most common considerations, they are not "a magical on/off switch that triggers rigid preconditions" to determine whether an officer's conduct constituted excessive force. *Scott v. Harris*, 127 S.Ct. 1769, 1777 (2008). Consequently, courts consider other factors, such as the availability of alternative methods of capturing or detaining the suspect in determining reasonableness. *See Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994). Courts may also consider the demeanor of the suspect, and whether the suspect was fighting with the police or was intoxicated or noncompliant. *See Davenport v. Causey*, 521 F.3d 544, 551 (6th Cir. 2008) (collecting cases). Ultimately, the use of force "must be judged from the perspective of a reasonable office on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396-97.

Applying these principles to the instant case, the Court finds that the officers' use of force in effectuating the arrest and detention of Plaintiff was reasonable under the circumstances for the following three reasons. First, there is no question Plaintiff posed a clear risk to herself, the Walds, and the officers given her mental state. *See Drummond*, 343 F.3d at 1058 ("[A] detainee's mental illness must be reflected in any assessment of the government's interest in the use of force."). Plaintiff was high on cocaine; had further proved

her delusional state to the officers by asking them whether they were real police officers and if they had been hired by her husband to kill her; and had also taken Mrs. Wald to the ground with enough force to tear her blouse open. A reasonable police officer confronted with these circumstances would believe that using force to subdue the individual to prevent further injury to the public or to themselves was justified.

Second, there is no dispute that she resisted arrest, and objective testimony reveals that she did so with substantial force. Again, the testimony of Mr. Wald is revealing on this point:

Q: Okay. Was she struggling in a weak fashion, just kind of moving a little bit, or was it more forceful?

A: *It was forceful. I was amazed.*

Q: Why were you amazed?

A: I knew she was athletic because I'd seen her take off on her bicycle on more than one occasion, and I do believe maybe she ran as well . . . *But I was still kind of amazed at the resistance that she put up. She wasn't going to be taken lightly.*

Q: Even when she was in handcuffs, she was still resisting strongly?

A: Back and forth, yes.

Q: Kicking her legs as well?

A: That's correct.

Q: Did she kick at the officers?

A: I didn't think of it that way. I [] knew she was kicking . . .and *she was doing everything in her power not to be subdued. And she was – she was acting pretty powerful, because I noticed the police were having trouble subduing her. I was amazed. I really was. I didn't think she had it in her.*

(Dep. of Edwin Wald, 56:21-57:20) (emphasis added).

Coupled with the fact that Plaintiff clearly acknowledges that she was resisting arrest as mentioned above, there is no question that Plaintiff was actively attempting to evade arrest. Plaintiff's violent behavior weighs heavily in favor of a finding that the officers' use of force was justified. *See Gates*, 27 F.3d at 1441 (noting that the most important element of the three *Graham* factors is "whether the suspect poses an immediate threat to the safety of the officers or others").

Lastly, the officers did not resort to more forceful means to arrest and detain Plaintiff. For instance, the officers did not deploy a taser despite Plaintiff's violent and aggressive behavior. No batons or other weapons were used. Instead, the officers applied the least force necessary to subdue Plaintiff by wrestling her to the floor. Relatedly, Plaintiff makes no other allegations outside of a passing reference that she may have chipped her tooth that the officers engaged in any affirmative behavior that caused any additional injuries after she was wrestled to the floor. Plaintiff only contends that she was "held to the floor for at least ten minutes while handcuffed with a broken arm and dislocated shoulder." (Dkt. #18 at 9). However, this was certainly reasonable given Plaintiff's violent and aggressive behavior that escalated throughout the incident. There is simply no claim or evidence that suggests that the officers applied any additional force other than holding her on the floor.

Overall, the Court finds that the officers did not engage in any unconstitutional conduct. Plaintiff was high on cocaine, and had clearly used aggression and force towards Mrs. Wald, the officers, and herself. Under such circumstances, the officers used the most reasonable and least intrusive method of subduing Plaintiff. Any injuries sustained by Plaintiff were a reasonable consequence of Plaintiff's own behavior. Indeed, Fourth Amendment jurisprudence has recognized that "the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. As a result, Plaintiff's excessive force claims against the officers shall be dismissed.

### 3. Plaintiff's Remaining Federal Claims

Plaintiff also brings false arrest and excessive force claims against Chief Kerlikowske and the City in their supervisory capacities. However, there is no basis for these claims because the Court has established that no constitutional right has been violated. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994) ("Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred.") (internal quotations and citation omitted). Accordingly, all of Plaintiff's federal claims under 42 U.S.C. § 1983 against all Defendants shall be dismissed.

### E. Plaintiff's State Law Claims

Plaintiff also brings various state law claims against the Defendants. These claims include assault and battery, false arrest, negligence, and negligent hiring, training and supervision. The first three claims are directed at both the officers and the remaining Defendants under the theory of respondeat superior. The latter negligent supervision claim is directed at Chief Kerlikowske and unnamed police officers in their supervisory capacities.

With respect to the first three state law claims, it is well recognized that an officer has qualified immunity from state tort claims where the officer "(1) carries out a statutory duty, (2) according to procedures dictated to him by statute and superiors, and (3) acts reasonably." *Staats v. Brown*, 139 Wash.2d 757, 778 (2000); *see also Wafer v. Nanson*, 2009 WL 423986, *6 (W.D. Wash., Feb. 17, 2009). Here, there is no question that the officers have qualified immunity. The officers were carrying out their fundamental duties as peace officers pursuant to RCW 10.93.070. The officers were also acting pursuant to police department procedures that are consistent with the procedures proscribed by statute. (*See* Dec. of Lynch, Ex. H). Lastly, the officers acted reasonably as established above in the Court's probable cause and excessive force analysis. Thus, Plaintiff's state law claims against the officers are dismissed.

Plaintiff's claims against the City under respondeat superior are equally meritless. Respondeat superior imposes liability on an employer for the tortious acts of an employee who is acting in the scope of employment on the employer's behalf. *See Niece v. Elmview Group Home*, 131 Wash.2d 39, 48, 929 P.2d 420 (1997). Because the Court has found that the officers did not engage in any tortious conduct, no liability attaches to the City. Therefore all of Plaintiff's state law claims against the City shall be dismissed.

With respect to Plaintiff's negligent hiring, training, and supervision claim, Washington law recognizes that an employer has "a limited duty to control an employee for the protection of third parties." *Id*. at 51. Specifically, "[a]n employer may be liable for harm caused by an incompetent or unfit employee if (1) the employer knew, or in the exercise of ordinary care, should have known of the employee's unfitness before the occurrence; and (2) retaining the employee was a proximate cause of the plaintiff's injuries." *Betty Y. v. Al-Hellou*, 98 Wn.

App. 146, 148-49, 988 P.2d 1031 (1999) (citations omitted). "Washington cases have generally interpreted the knowledge element to require a showing of knowledge of the dangerous tendencies of the particular employee." *Niece*, 131 Wash.2d at 52.

Here, Plaintiff has produced no objective evidence that Chief Kerlikowske had any knowledge of any dangerous tendencies of either Officer Hagemann or Officer Hanley. Nor does Plaintiff submit any evidence showing that Chief Kerlikowske should have known that either of the officers were unfit and should not have been retained. Most importantly, the Court has established that Officer Hagemann and Officer Hanley were not incompetent or unfit during this incident, thereby precluding any negligent supervision claim against Chief Kerlikowske. Accordingly, all of Plaintiff's state law claims fail.

### III. CONCLUSION

Having reviewed the relevant pleadings, and the remainder of the record, the Court hereby finds and ORDERS:

(1) Defendants' Motions for Summary Judgment (Dkts. #14 and #15) are GRANTED. Plaintiff's claims are dismissed with prejudice. This case is now CLOSED.

(2) The Clerk is directed to forward a copy of this Order to all counsel of record.

DATED this 8th day of April, 2009.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE